# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 11, 2006        Decided March 2, 2007

No. 05-1222

PORT AUTHORITY OF NEW YORK AND NEW JERSEY
PETITIONER

v.

DEPARTMENT OF TRANSPORTATION AND
MARY E. PETERS, SECRETARY OF TRANSPORTATION,
RESPONDENTS

BRENDAN AIRWAYS, LLC, *D/B/A* USA3000 AIRLINES, ET AL.,
INTERVENORS

———

Consolidated with
05-1276, 05-1316

———

On Petitions for Review of Orders of the
United States Department of Transportation

———

*Jeffery A. Tomasevich* argued the cause for petitioner Port Authority of New York and New Jersey. With him on the briefs were *Steven S. Rosenthal*, *Douglas A. Tucker*, and *Carlene V. McIntyre*.

*John Longstreth* argued the cause for petitioners Brendan Airways, LLC, et al. With him on the briefs were *James R. Weiss* and *Christopher S. Huther*.

*Patricia A. Hahn*, *Thomas R. Devine*, and *Arthur P. Berg* were on the brief for *amicus curiae* Airports Council International - North America in support of petitioner Port Authority of New York and New Jersey and in opposition to petitioners Brendan Airways, LLC, et al.

*David J. Frantz* was on the brief for *amicus curiae* United Kingdom of Great Britain and Northern Ireland in support of petitioners Brendan Airways, LLC, et al., urging affirmance in part and reversal in part.

*Mary F. Withum*, Trial Attorney, U.S. Department of Transportation, argued the cause for the respondents. With her on the brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Steven J. Mintz*, Attorneys, *Jeffrey A. Rosen*, General Counsel, U.S. Department of Transportation, *Paul M. Geier*, Assistant General Counsel, and *Dale C. Andrews*, Deputy Assistant General Counsel. *John J. Powers, III*, Attorney, U.S. Department of Justice, entered an appearance.

*Steven S. Rosenthal*, *Jeffery A. Tomasevich*, *Douglas A. Tucker*, and *Carlene V. McIntyre* were on the brief for intervenor Port Authority of New York and New Jersey in support of the respondents.

*James R. Weiss* and *John Longstreth* were on the brief for intervenors Brendan Airways, LLC, et al. in support of the respondents.

Before: TATEL and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: The Port Authority of New York and New Jersey ("Port Authority") runs Newark Liberty International Airport ("EWR"). When the Port Authority increased the fees charged at EWR's International Terminal B ("ITB"), thirteen airlines operating out of that terminal complained to the Department of Transportation ("DOT") pursuant to 49 U.S.C. § 47129, claiming the rates were unreasonable and unjustly discriminatory. The DOT agreed with the airlines in part and ordered the Port Authority to issue revised fees and to refund excess fees already collected. Deeming the DOT's orders insufficient, the complainant airlines sought review in this court, disputing the DOT's evidentiary rulings and its finding that the proposed fees were nondiscriminatory. The Port Authority likewise petitioned for review, contending its rate calculations were in fact reasonable. More fundamentally, the Port Authority argued § 47129 applied only to U.S. air carriers and thus excluded twelve of the thirteen complaining airlines. For reasons discussed below, we grant the Port Authority's petitions for review, deny the airlines' petition for review, and remand to the DOT for further proceedings.

I

A 1998 report commissioned by the Port Authority indicated ITB would soon reach capacity. In response, the Port Authority negotiated a deal with Continental Airlines ("Continental") permitting Continental to expand Terminal C, which Continental leased from the Port Authority for its exclusive use pursuant to a 1985 agreement. Continental issued over $700 million in bonds to fund the construction of C-3, a new interna-

tional concourse at Terminal C, and the Port Authority leased the land for C-3 to Continental. Continental then moved its international flights from ITB to C-3.

Carriers operating international flights out of ITB pay the Port Authority Federal Inspection Facility Space ("FIS") fees on all incoming international passengers who are not pre-screened, and General Terminal Charge ("GTC") fees on all passengers, whether domestic or international and whether inbound or outbound. In return, the Port Authority maintains the gates and FIS facilities at ITB. The Port Authority does not charge GTC or FIS fees at Terminal C but recovers costs from Continental through its fixed lease.

Following the attacks of September 11, 2001, traffic at EWR declined, and with it the Port Authority's FIS and GTC revenues. Continental's move to C-3 exacerbated the situation. In response, the Port Authority decided to raise FIS and GTC fees at ITB. Carriers complained, demanding a more adequate explanation and threatening to leave EWR if the Port Authority increased rates by too much. However, the Port Authority persevered and implemented the increase effective February 1, 2005, raising FIS fees from $13.50 to $22 per person and GTC fees from $5.50 to $8 per person.

Thirteen of the eighteen carriers at ITB filed a 49 U.S.C. § 47129 complaint ("the Complaint"), arguing the increase was unreasonable. Of these thirteen carriers ("the Complainants" or "the Airlines"), only Brendan Airways is a U.S. air carrier. The Complainants paid the fee increase under protest during the DOT adjudication, and the Port Authority posted bonds to cover any repayments the DOT might order.

The DOT determined the Complaint constituted a significant dispute. Instituting Order, *Brendan Airways, LLC*, Order 2005-3-21, Docket OST-05-20407-36, at 19 (DOT Mar. 16,

2005). The DOT denied the Port Authority's motion to exclude the foreign carriers and issued two discovery orders: (1) ordering the Port Authority to disclose specified documents related to the proposed rate increase; and (2) establishing standards for the Administrative Law Judge ("ALJ") to use in subsequent evidentiary rulings in light of the Airlines' failure to include supporting testimony with their Complaint, an oversight that exposed them to limits under 14 C.F.R. §§ 302.603–605 on their ability to introduce evidence.

The Complainants sought to have additional documents disclosed and to depose a Port Authority employee regarding the disclosures—requests the ALJ denied. The ALJ likewise generally denied a motion to introduce expert testimony responding to the disclosures, allowing additional testimony only to the extent it was advertised in the Airlines' original pleadings.

At the hearing, the Complainants claimed the Port Authority's "Expense Reclassification charge" from 2004 should not have been included in the cost forecast for 2005. In addition, they contended the Port Authority's lease to Continental effectively charged Continental much lower GTC and FIS fees, giving that airline an unfair advantage.

The ALJ issued a Recommended Decision, *Brendan Airways, LLC*, Docket OST-05-20407-116 (DOT May 9, 2005), *available at* http://dms.dot.gov/reports, which the DOT reviewed and substantially adopted in its own Final Decision, *Brendan Airways, LLC*, Order 2005-6-11, Docket OST-05-20407-129 (DOT June 14, 2005). The Final Decision determined: (1) it was unreasonable for the Port Authority to include its 2004 Expense Reclassification charge in its forecast for 2005 direct costs; (2) the Complainants failed to demonstrate unjust discrimination; and (3) the ALJ's evidentiary rulings were proper.

The DOT ordered the Port Authority to revise its proposed FIS and GTC fees and to compensate the Complainants for amounts collected beyond those revised fees. The DOT accepted the Port Authority's revised proposal, which excluded the Expense Reclassification charge. *Brendan Airways, LLC*, Order 2005-7-10, Docket OST-05-20407-133, at 6 (DOT July 12, 2005) ("July 12 Order"). With the DOT's permission, the Port Authority repaid the excess in the form of credits on the Complainants' accounts.

The Port Authority and the Complainants both sought judicial review of the Final Decision in timely fashion. *See* 49 U.S.C. § 46110. In a subsequent—but likewise timely—petition for review, the Port Authority challenged the July 12 Order, which instituted fees the Port Authority had proposed only under protest. The Port Authority asks this court to vacate the DOT's denial of its motion to dismiss the foreign carriers and to reverse the DOT's determination that it was unreasonable to include the Expense Reclassification charge in cost forecasts. The Complainants, meanwhile, challenge the ALJ's evidentiary rulings, and ask us to vacate the DOT's determination that the proposed fees were nondiscriminatory, as well as any other orders relying on those evidentiary rulings. We address the claims of each petitioner in turn.

II

We first consider the Port Authority's contention that 49 U.S.C. § 47129 adjudication procedures are available only to U.S. air carriers. As a threshold matter, the DOT claims the Port Authority forfeited this argument by failing to raise it in its brief to the Secretary before the Final Decision. Indeed, this court may not consider objections to final orders in § 47129 adjudications "unless objection was urged before an administrative law judge or the Secretary at a proceeding under this subsection

[§ 47129(c)] or, if not so urged, unless there were reasonable grounds for failure to do so." 49 U.S.C. § 47129(c)(6). However, that same subsection requires the Secretary to "dismiss the complaint if no significant dispute exists or . . . [to] assign the matter to an administrative law judge." § 47129(c)(2). The Port Authority challenged the participation of the foreign carriers during the DOT's determination of whether a "significant dispute" existed—a "proceeding under this subsection." Thus, we have jurisdiction to review the DOT's ruling.

Turning to the merits, we begin with the statute. Section 47129 establishes an expedited process for determining whether fees imposed on "one or more air carriers (as defined in section 40102 of this title)" are reasonable. 49 U.S.C. § 47129(a)(1). The problem, as illustrated by this case, is that § 40102 contains definitions for both "air carrier," § 40102(a)(2), and "foreign air carrier," § 40102(a)(21). In the vernacular, "foreign air carrier[s]" would appear to comprise a subset of "air carrier[s]," but § 40102 instead mandates that the two sets be *disjoint*. Only a United States citizen can be an "air carrier" in the sense of (a)(2), while only a non-citizen can be a "foreign air carrier" in the sense of (a)(21). The DOT however maintains that in § 47129, unlike in § 40102(a)(2), the term "air carrier" embraces *all* providers of air transportation, regardless of citizenship. *See* 14 C.F.R. § 302.601(a) (2006) ("This subpart contains the specific rules that apply to a complaint filed by one or more air carriers or foreign air carriers ('carriers'), pursuant to 49 U.S.C. 47129(a) . . . ."); Policy Regarding Airport Rates and Charges, 61 Fed. Reg. 31,994, 32,019 ¶ 1.2.1 (June 21, 1996) [hereinafter Policy Statement] (same).

Brendan Airways and twelve foreign air carriers filed a § 47129 complaint requesting determination of the reasonableness of the proposed rate increase. The Port Authority concedes Brendan Airways is an "air carrier" even within the narrow definition laid out in § 40102(a)(2), and hence that the DOT

acted within its authority when it issued the requested determination.

The disagreement centers on the remedies available to the foreign complainants. Under § 47129, amounts paid under protest by "a complainant air carrier" are subject to refund if the fees are deemed unreasonable, and to assure timely repayment, "the airport shall obtain a letter of credit, or surety bond, or other suitable credit facility, equal to the amount in dispute." § 47129(d)(1)(B)–(C). If the non-U.S. complainants are not "air carriers" in the sense of § 47129(a)(1), then they were not properly parties to the § 47129 complaint and cannot qualify for the refunds due "complainant air carrier[s]." Moreover, if § 47129(d)(1)(B) gives the DOT no authority to order airports to refund excess fees to non-U.S. carriers, then the § 47129(d)(1)(C) requirement that airports obtain bonds to secure such potential payments likewise disappears. Thus, this issue's resolution hinges on whether "air carrier" in § 47129(a)(1) includes non-U.S. carriers.

In resolving this question, we must first determine the appropriate standard of review. Agency interpretations of the statutes they administer are generally reviewed according to the deferential standard set out in *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984). When applying that standard of review, we must give effect to the intent of Congress if that intent is clear. *Id.* at 842–43. If instead the statute is silent or ambiguous with respect to the issue at hand, we should defer to the agency's interpretation so long as it is reasonable. *Id.* at 843–44. In determining whether the intent of Congress is clear, we avail ourselves of traditional tools of statutory construction. *Id.* at 843 n.9.

However, we do not automatically apply *Chevron* deference regardless of the context. Statutory interpretations by agencies are "not entitled to deference absent a *delegation of authority*

from Congress to regulate in the areas at issue." *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002); *see also Gonzales v. Oregon*, 126 S. Ct. 904, 916 (2006) (applying *Chevron* deference only to those interpretations "promulgated pursuant to authority Congress has delegated" to the agency).

Here, Congress delegated authority to the DOT to regulate in this area, but that power was arguably limited to designing § 47129 adjudication procedures and setting rules for determining whether a fee is reasonable. *See* 49 U.S.C. § 47129(b). Thus, the DOT's interpretation at 14 C.F.R. § 302.601(a) of § 47129 as including non-U.S. carriers was not issued pursuant to any explicit delegation. Still, such a delegation can be implicit, in which case "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844; *see also Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc). Furthermore, the fact that the statutory language in question determined the scope of the DOT's authority to adjudicate, and in particular to order retroactive awards, does not in itself render *Chevron* inapplicable. *See Detroit Edison Co. v. FERC*, 334 F.3d 48, 53 (D.C. Cir. 2003); *Independent Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1040 (D.C. Cir. 2002).

In the end, we need not definitively answer this question, because we find that the reference in § 47129 to air carriers "as defined in section 40102 of this title" unambiguously incorporates § 40102(a)(2)'s limitation of this term to U.S. citizens. The Complainants as intervenors, the DOT as respondent, and the Government of the United Kingdom as amicus offer several arguments in opposition to this reading of § 47129. As we would vacate the DOT's interpretation even under the more deferential *Chevron* standard, we shall assume in reviewing these arguments that *Chevron* applies.

First, the Complainants contend that since § 47129 refers to air carriers "as defined in section 40102" and not "as defined in section 40102(a)(2)," the statute actually incorporates *all* of the definitions from § 40102, including in particular both (domestic) air carriers at § 40102(a)(2) and foreign air carriers at § 40102(a)(21). If § 40102(a)(2) in fact defined "*domestic* air carrier" rather than simply "air carrier," this argument would clearly carry the day. But even as § 40102 stands, the Complainants' suggestion is at least plausible, for assuming the drafters of § 47129 intended to include both "air carriers" and "foreign air carriers," there is no obvious, succinct formulation that encapsulates the union of those two terms and no more.

The Complainants effectively read § 40102 as bifurcating the generic category "air carrier" and then (inconveniently) assigning to one subdivision the name commonly associated with the broader class. In such a circumstance, an external provision using the term "air carrier" might well be read to mean either the specific subdivision defined in § 40102(a)(2) or else the more general category, depending on the context.

Section 40102(a)(2) defines "air carrier" as "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation." If § 40102(a)(21) defined "foreign air carrier" as "a person, not a citizen of the United States, undertaking by any means, directly or indirectly, to provide air transportation," then the question would be close. We would have a natural concept, namely "a person undertaking by any means, directly or indirectly, to provide air transportation," which would commonly be termed "air carrier," and which would be subdivided by § 40102 into (domestic) "air carrier" and "foreign air carrier" based on citizenship, with the term "air carrier" thus rendered ambiguous.

But § 40102(a)(21) does *not* define "foreign air carrier" that way. Rather, it states that "foreign air carrier" means "a person,

not a citizen of the United States, undertaking by any means, directly or indirectly, to provide *foreign* air transportation." § 40102(a)(21) (emphasis added). Section 40102(a)(5) in turn defines "air transportation" as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft," so that "foreign air transportation" is a strict subset of "air transportation." Hence, the definition of "foreign air carrier" is twice distinguished from the definition of "air carrier"—first by citizenship, and second by the type of transportation provided.

Thus, the Airlines' argument breaks down. If § 40102 merely subdivided the pre-statutory term "air carrier" based on U.S. citizenship, then § 47129's explicit citation to § 40102 could perhaps be taken as a reference only to the shared terms in § 40102(a)(2) and § 40102(a)(21). But given that the two definitions, taken together, indicate no natural, broader concept, we cannot force such a tortured interpretation on § 47129. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context . . . ."). We therefore reject the Airlines' first argument.

Second, the Complainants point to § 47129(e)(1), which states that § 47129 does not apply to "a fee imposed pursuant to a written agreement with *air carriers* using the facilities of an airport." § 47129(e)(1) (emphasis added). By their logic, if "air carriers" means only "U.S. air carriers" in § 47129, then § 47129(e)(1) pointedly bars only *U.S.* air carriers from challenging fees imposed pursuant to written agreements, so that by implication *foreign* air carriers may indeed challenge such fees via § 47129. Arguing that challenges by any carrier to fees imposed pursuant to written agreements would run counter to the purpose of the statute, the Complainants reason that § 47129(e)(1) must be read to exclude both U.S. and foreign carriers, and hence that "air carriers" in § 47129(e)(1) covers foreign carriers as well. With no indication that "air carriers"

should mean different things in different parts of § 47129, the Complainants then infer that this same, broad definition applies in § 47129(a)(1).

But this argument ignores the basic structure of § 47129. Section 47129(a)(1) states that "air carriers," and only air carriers, may make use of § 47129. Section 47129(e)(1) does not provide an exhaustive list of all persons unable to use § 47129, but rather merely carves out specific exceptional circumstances in which the "air carriers" mentioned in § 47129(a)(1) cannot use § 47129, that earlier subsection notwithstanding. Therefore, regardless of how we interpret "air carrier," § 47129(e)(1) cannot be read to authorize anyone to contest fees imposed pursuant to written agreements. Section 47129(e)(1) thus provides no insight into the proper interpretation of "air carrier" in § 47129, and we reject the Complainants' second argument.

Third, all three parties argue that there is no legislative history indicating an intention to exclude foreign air carriers from § 47129 procedures.[1]   In the words of the Complainants,

_____

[1] The Airlines in fact maintain that the legislative history reveals a clear intention to *include* foreign air carriers, but none of their citations are convincing.  Senator Ford's assurance that § 47129 "will not affect the fees and arrangements that are a part of a written agreement between an airport and the airlines," 140 CONG. REC. 13,261 (1994), merely restates § 47129(e)(1), and is equally true regardless how "air carrier" is interpreted.  Senator Feinstein's reference to "a partnership interest between air carrie[r]s and airport owners" indeed appears to include foreign air carriers, but Senator Feinstein was not describing the effects of the immediate bill but rather broadly opining on "the entire reason we are dealing with the issue of rates and charges."  140 CONG. REC. at 13,264.  Senator Feinstein further emphasized that the bill would not affect the ongoing dispute in Los Angeles, *id.* at 13,265, but since § 47129(e)(2)–(3) and (f)(2) explicitly exclude preexisting conflicts from the new procedure,

"The Port Authority does not cite a shred of evidence based on the history, purpose or structure of the statute to support its notion that Congress intended to deny foreign carriers the benefits of Section 47129."  Comp'ts' Intervenor Br. 17.  Amicus amplifies this point, claiming it would have been "inconsistent" and not "logical" for Congress to create an expedited adjudication procedure that excluded foreign air carriers so soon after the United States signed a bilateral agreement with the United Kingdom requiring each party to "maintain a system to safeguard users from charges that do not meet the criteria" of the agreement, including "a process for resolving complaints which the contracting parties in principle expect to be used in the first instance."  U.K.'s Amicus Br. 14 (internal quotation marks omitted) (quoting Agreement Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland Concerning Air Services, U.S.-U.K., July 23, 1977, 28 U.S.T. 5367, *as amended by* Agreement Between the United States of America and the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 11, 1994, T.I.A.S. No. 12,536 [hereinafter Bermuda II], art. 10(4)).

Indeed, legislative history is silent on this point.  Section 47129 began life as House Bill 2739 in 1993.  The House of Representatives' version of the bill made no reference to expedited resolution of fee disputes.  *See* H.R. 2739, 103d

---

this again sheds no light on the meaning of "air carrier."  This court had occasion to interpret these same comments in *Los Angeles Department of Airports v. U.S. DOT*, 103 F.3d 1027 (D.C. Cir. 1997).  But our statement there that "Congress specifically intended that the airlines be able to use the newly-created procedure to challenge the LAX fee increase," *id.* at 1037, concerned the time limits in 49 U.S.C. § 47129(a)(1)(B), not the applicability of § 47129 to foreign air carriers.  All in all, the Airlines point to no statement that proves even one Senator or Representative intended § 47129 to cover non-U.S. carriers, much less that the majority in each chamber agreed.

Cong., 139 CONG. REC. 24,036–54, 24,272–81 (as passed by House of Representatives, Oct. 13, 1993). The Senate's version would have inserted most of the current § 47129 into the Airport and Airway Improvement Act of 1982, Pub. L. No. 97-248, tit. V, 96 Stat. 324, 671–702, in which the definitions now contained at 49 U.S.C. § 40102 did not apply. H.R. 2739, sec. 504, § 536, 103d Cong., 140 CONG. REC. 13,513, 13,520–21 (as passed by Senate, June 16, 1994). The reference to the § 40102 definition first appeared in the conference report reconciling these two versions, which provided no explanation for the change, absent which the DOT would have been free to interpret "air carrier" in the resulting provision in any reasonable fashion. H.R. REP. NO. 103-677, at 9, 69 (1994) (Conf. Rep.). Congress's motivation in adopting this new provision must hence remain a mystery.

But ours not to reason why: Be it ever so illogical and inconsistent with government policy, § 47129 was duly passed by Congress and signed by the President, and we must give it effect. The plain language of a statute is strong evidence of Congress's intent. *See Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) ("The most reliable guide to congressional intent is the legislation the Congress enacted . . . ."). We certainly cannot aggrandize an agency's power in contravention of such plain language based solely on Congressional silence as to the impetus behind its chosen phrasing. That way madness lies. *See Ry. Labor Executives' Ass'n*, 29 F.3d at 671 ("Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well."). We therefore refuse the DOT's invitation to pare § 47129 down to only those portions explained in the Congressional Record.

Fourth, the DOT argues § 47129 must be construed in keeping with the United States' international commitments as a

matter of basic statutory interpretation.[2]  According to the DOT and the United Kingdom, the United States would be in breach of Bermuda II if it barred non-U.S. carriers from § 47129 adjudications, given that the DOT's alternative fee dispute procedure, 14 C.F.R. Part 16, does not clearly authorize retroactive remedies.[3]  As the DOT rightly notes, "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804).  But this leaves open the question of whether the DOT's proposed construction is possible.  As the Supreme Court has cautioned:

> When [a treaty and a federal statute] relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but if the two are inconsistent, the one last in date will control the other, provided always the stipulation of the treaty on the subject is self-executing.

---

[2] The DOT's suggestion that such interpretation is required by 49 U.S.C. § 40105(b)(1) is incorrect.  Section 40105(b)(1) states that "[i]n carrying out *this part*, the Secretary of Transportation and the Administrator . . . shall act consistently with obligations of the United States Government under an international agreement."  § 40105(b)(1) (emphasis added).  But § 40105 is in Part A of Title 49, Subtitle VII, while § 47129 is in Part B of that subtitle.

[3] Whether Part 16 can be so interpreted as to permit such retroactive remedies is a question for the DOT in the first instance, and we do not purport to decide it today.  Likewise, while 14 C.F.R. § 16.1(a) disallows the use of Part 16 in "disputes between U.S. and foreign air carriers and airport proprietors concerning the reasonableness of airport fees covered by 14 CFR part 302," which regulates § 47129 adjudications, in light of our holding today it is unclear whether § 16.1(a) still bars foreign air carriers from Part 16 procedures, and the DOT has the first say in this matter.

*Whitney v. Robertson*, 124 U.S. 190, 194 (1888). Where, as here, the statute admits of only one reasonable interpretation, that interpretation governs even in the face of strongly contrary language in earlier international agreements.[4]

Fifth, the DOT urges us to interpret § 47129 in light of the since-deleted section 101 of the Federal Aviation Act of 1958. In relevant part, this provision read as follows:

> As used in this Act, *unless the context otherwise requires—*
>
> . . . .
>
> (3) "Air carrier" means any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation . . . .

Federal Aviation Act of 1958, Pub. L. No. 85-726, § 101, 72 Stat. 731, 737 (codified with some differences in language at 49 U.S.C. app. § 1301 (1988)) (repealed 1994) (emphasis added). This definition was codified at 49 U.S.C. § 40102 by Public Law No. 103-272 in 1994, prior to the passage of § 47129. The codification act changed "As used in this Act" to "In this part" and dropped entirely the proviso, "unless the context otherwise requires."[5] However, that same act indicated that its first four

---

[4] In similar fashion, the DOT's assertion that its interpretation deserves especial deference on account of its vintage fails to change the final result. It is true that we "will normally accord particular deference to an agency interpretation of longstanding duration," *Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (internal quotation marks omitted); *see also Sec'y of Labor v. Excel Mining, LLC*, 334 F.3d 1, 7–8 (D.C. Cir. 2003), but as such deference must still yield to the plain meaning of the statute, this point more properly addresses the second step under *Chevron*, which we do not reach.

[5] The change from "Act" to "part" is less dramatic than it appears. All but one of the references to "air carriers" in the Federal Aviation

sections, which restated and replaced laws not yet codified, "may not be construed as making a substantive change" in "laws enacted before July 1, 1993." Act of July 5, 1994, Pub. L. No. 103-272, § 6(a), 108 Stat. 745, 1378. The DOT infers that, if the deletion of the context proviso effected no substantive change, then the proviso must be implicit in 49 U.S.C. § 40102. By this logic, when § 47129 appeals to § 40102 for the definition of "air carrier," it incorporates the proviso and is hence susceptible to variable interpretation. If true, this would take us to the second step of *Chevron*.

But the DOT's analysis misses the mark. Even if we assume *arguendo* that § 47129 incorporates the context proviso, the context surrounding "air carrier" in § 47129(a)(1) in fact demands a narrow reading of that term. Specifically, § 47129(a)(1) says to interpret "air carrier" "as defined in section 40102 of this title." 49 U.S.C. § 47129(a)(1). Absent this explicit cross-reference, the definition from § 40102 would not apply to § 47129, as § 47129 is in Part B of Title 49, Subtitle VII, while § 40102 covers only Part A of that subtitle. *See* § 40102(a). It can hardly have been Congress's intention to include this cross-reference and thereby incorporate the otherwise inapplicable definition, only to have the DOT disregard the definition. Thus, the cross-reference to § 40102, contained as it is in the immediate context of the term requiring interpretation, is determinative, and § 47129(a)(1) cannot be read to include foreign air carriers.[6]

Act were moved to Part A of Title 49, Subtitle VII. The lone exception, the current 39 U.S.C. § 5007(b), explicitly refers to the definition: "In this subsection, 'air carrier' and 'aircraft' have the same meanings given those terms in section 40102(a) of title 49." 39 U.S.C. § 5007(b)(1).

[6] The DOT cites two cases in which courts overrode the § 40102 definition for "air carrier" based on context. However, even leaving aside the fact that the cases were decided when section 101 of the Federal Aviation Act—including the context proviso—was still in

In summary, the language of § 47129(a)(1) leaves us no choice but to infer that Congress intended to limit § 47129 procedures to U.S. carriers. We must therefore give effect to that clear Congressional intent, the DOT's contrary interpretation of the statute notwithstanding. *Chevron*, 467 U.S. at 842–43. The DOT makes a compelling case for the more inclusive approach, which might indeed fit better with the United States' international obligations. But it is Congress, not the courts, that has the power to expand § 47129 to include foreign air carriers. *Cf. Friends of the Earth, Inc. v. EPA*, 446

---

force, they both dealt with statutes that referenced outside language supporting a broad definition, whereas here § 47129 references outside language supporting a *narrow* definition. In *South African Airways v. Dole*, 817 F.2d 119 (D.C. Cir. 1987), we analyzed the meaning of "air carrier" in section 306(a)(1) of the Comprehensive Anti-Apartheid Act of 1986, Pub. L. No. 99-440, 100 Stat. 1086, 1100 (repealed 1993), which referenced the Agreement Between the Government of the United States of America and the Government of the Union of South Africa Relating to Air Services Between Their Respective Territories, U.S.-S. Afr., May 23, 1947, 61 Stat. 3057 [hereinafter South Africa Agreement]. South Africa's power under the South Africa Agreement to "designate[]" carriers extended only to South African carriers. South Africa Agreement annex § 1. Hence, when section 306(a)(1) discussed "the rights of any air carrier designated by the Government of South Africa under the [South Africa Agreement]," the external language militated for an interpretation of "air carrier" that included foreign (specifically South African) companies. Similarly, in *Lawal v. British Airways, PLC*, 812 F. Supp. 713 (S.D. Tex. 1992), a district court interpreted "air carrier" in the phrase "any air carrier having authority under subchapter IV of this chapter to provide air transportation," 49 U.S.C. app. § 1305(a)(1) (1988), to include foreign air carriers, because "[s]ubchapter IV deals with economic regulation of various types of carriers, including foreign air carriers." *Lawal*, 812 F. Supp. at 718. Finally, the DOT's related reference to *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), is unpersuasive, as *Morales* did not discuss whether "air carrier" included foreign air carriers.

F.3d 140 (D.C. Cir. 2006) (instructing the EPA to "take its concerns to Congress" if it objected to the plain meaning of a statute). In keeping with the statute as it currently stands, we grant the Port Authority's petition for review of the Final Decision and set aside the DOT's denial of the Port Authority's motion to dismiss the Complaint as to the twelve non-U.S. carriers.

III

Pursuant to 49 U.S.C. § 47129(a)(1), the DOT declared the Port Authority's new GTC and FIS fees unreasonable to the extent they were based on a $2.13 million "Expense Reclassification charge" from 2004. The Port Authority now asks us to reverse this determination.

Section 47129(b) instructed the Secretary of Transportation to publish, not later than November 21, 1994, "regulations, policy statements, or guidelines establishing . . . the standards or guidelines that shall be used by the Secretary in determining . . . whether an airport fee is reasonable." 49 U.S.C. § 47129(b). In response, the DOT released the Policy Statement, 61 Fed. Reg. 31,994, described above. The Policy Statement placed separate limits on airfield fees and non-airfield fees. *Compare* Policy Statement ¶ 2.5.1 ("In determining the total costs that may be recovered from fees for the use of airfield assets and public-use roadways in the rate base, the airport proprietor must value them according to their historic cost to the original airport proprietor (HCA).") *with id.* ¶ 2.6 ("For other facilities and land . . . , the airport proprietor may use any reasonable methodology to determine fees, so long as the methodology is justified and applied on a consistent basis to comparable facilities . . . ."). This court deemed the DOT's disparate treatment of airfield and non-airfield fees arbitrary and capricious, *Air Transp. Ass'n v. DOT*, 119 F.3d 38, 41–44 (D.C. Cir. 1997), and thus vacated

many paragraphs of the Policy Statement, *id.* at 45, *as modified on reh'g*, 129 F.3d 625. To date, the DOT has not revised the Policy Statement. *See* Policy Regarding Airport Rates and Charges, 68 Fed. Reg. 6530 (Feb. 7, 2003) (withdrawing Advance Notice of Proposed Policy, which was to supersede the Policy Statement).

Lacking a regulation directly applicable to FIS and GTC (non-airfield) fees, the DOT used the Policy Statement's rules for airfield fees as "guidance." Final Decision at 11. Uniform application of such rules to both airfield and non-airfield fees would at least arguably resolve the problems we noted in *Air Transport Ass'n*. The Port Authority contested the applicability of those Policy Statement rules before the DOT but did not renew this objection before us. Hence, we assume without deciding that Policy Statement paragraphs 2.2 to 2.5.4 provide a valid test for the reasonableness of the disputed fees.

Under the Policy Statement, fees are unreasonable if they generate revenue exceeding the "rate base"; *i.e.*, the cost of providing airport services to aeronautical users. Policy Statement ¶¶ 2.2–2.3, 4.2; *see also* 49 U.S.C. § 47107(b)(1) (listing permissible uses of airport revenues). In setting fees for 2005, the Port Authority forecasted its 2005 costs based on actual costs for 2002–2003 and estimated costs for 2004. Direct International Facility Expenses made up the largest component of these costs. The Port Authority scaled up its 2004 Direct International Facility Expenses by 3% for its 2005 forecast. The 2004 figure included an Expense Reclassification charge of $2,131,482. Hence, in effect, the Port Authority predicted that it would take a similar Expense Reclassification charge in 2005. Moreover, the proposed fee increase was predicated on the inclusion of the Expense Reclassification charge in the rate base, with the Port Authority including that charge in the pro forma income statement it used to demonstrate the increased fees would result in no appreciable surplus. *See* Policy Statement ¶ 4.2 ("In

establishing new fees, and generating revenues from all sources, airport owners and operators should not seek to create revenue surpluses that exceed the amounts to be used for airport system purposes and for other purposes for which airport revenues may be spent under 49 U.S.C. § 47107(b)(1) . . . ."). The Port Authority now challenges the DOT's determination that it was unreasonable to include this Expense Reclassification charge forecast in its rate base for ITB.

The Expense Reclassification charge consists of two components. The first reflects signage expenditures that were erroneously coded as capital expenditures and then reclassified as operating expenses. If this error was both made and corrected in 2004, then the expenses recognized in 2004 properly reflect the costs allocable to that year, and it was appropriate for the Port Authority to include the reclassified signage expense in its 2005 cost forecast. However, if the signage expenditures reclassified in 2004 were in fact capitalized back in 2003, then it was unreasonable for the Port Authority to include that charge in its 2005 forecast: If such expenditures are made annually, then the 2004 income statement includes both 2004 signage expenses and reclassified 2003 signage expenditures, so that by including all 2004 expenses in its 2005 forecast, the Port Authority doubled the appropriate signage expense forecast; alternatively, if such expenditures are *not* made annually, then it was improper for the Port Authority to include in its 2005 forecast the full signage expense as recognized in 2004, rather than a pro-rated amount. In short, the Port Authority's treatment of the signage reclassification charge in its 2005 forecast was proper if and only if the expenditures underlying that charge were originally capitalized in 2004, not some earlier year.

The record gives no clear indication of whether the signage expenditures were capitalized in 2003 or 2004. The Complainants' witness, Dr. Daniel Kaplan, described the Expense Reclassification charge as "capital charges that had been

charged in the previous period," Tr. 97:11–12, but did not indicate whether this "period" was a previous year or just an earlier quarter within 2004. The Complainants' attorney asked the Port Authority's witness, David Kagan, whether this charge represented "expenses that were capitalized or anticipated as capital expenses *in prior years* that [the Port Authority] reclassified as costs *in this year, in 2004*," Tr. 396:4–6 (emphasis added), but Mr. Kagan's answer gave no indication of timing. The DOT's findings of fact are conclusive if supported by substantial evidence, 49 U.S.C. § 47129(c)(6), but here there is *no* evidence on the crucial issue of when the signage expenditures were originally capitalized. Accordingly, we vacate the Final Decision's current ruling on the reasonableness of including the signage component of the Expense Reclassification charge in the Port Authority's 2005 cost forecast, and we remand this case to the DOT for further consideration of that issue. In addition, we grant the Port Authority's petition for review of the July 12 Order and vacate that order to the extent it implements fees calculated pursuant to the DOT's ruling on the signage component.

The second component represents accumulated planning costs for capital projects that were canceled in 2004. In essence, the Port Authority argues that while this component includes costs incurred prior to 2004, Supp. Kagan Decl. 16 ¶ 59, the Complainants failed to demonstrate that similar charges would not be taken in subsequent years. We disagree. For the 2004 charge, which covers planning costs incurred over multiple years, to serve as a reasonable forecast for future single-year charges, it would have to be the case that the Port Authority routinely pursued multiple capital projects simultaneously and canceled at least one per year, of a magnitude similar to that seen in 2004. The record indicates no such pattern of annual cancellations. Mr. Kagan described as "normal Port Authority practice" the designation of capitalized planning costs as Expense Reclassification charges upon cancellation, *id.*, and yet

those charges registered exactly zero in 2002 and only $279,797 in 2003 before skyrocketing to over $2.13 million in 2004. Such a discrepancy casts significant doubt on the 2004 figure as an accurate basis for forecasts.[7] We therefore find the DOT's determination that 2004's canceled project charge was not representative to be supported by substantial evidence and hence conclusive.

In rebuttal, the Port Authority argues its forecast for 2005 Direct International Facility Expenses was lower than the average from 2002 to 2004, so that it could not be an unreasonable forecast. However, this merely shows the Port Authority reduced direct expenses other than the Expense Reclassification charge between 2003 and 2004. The similarity between 2002–2003 costs and the 2005 forecast is probative only if it was expected that those reduced direct expenses would return to 2003 levels in 2005, and the Port Authority presented no evidence to support this theory.

In the alternative, the Port Authority cites Policy Statement ¶ 2.3, which allows "all costs" to be included in the rate base, and reasons that it was improper for the DOT to declare the Expense Reclassification charge in the rate base unreasonable simply because it was not an "ordinary and recurring" expense. While the ALJ arguably did treat "ordinary and recurring" status as a sine qua non for inclusion in the rate base, Recommended Decision at 14, it is the DOT's Final Decision that we must review, and that decision was rather more nuanced:

> While we agree generally with the principle cited by the Port Authority that it is entitled to recover its costs incurred,

---

[7] While the record does not indicate how much of the 2004 charge comes from each of the two components, the complete absence of such a charge in 2002, on its own, provides substantial evidence for the DOT's finding.

we disagree that the Port Authority is entitled to use $2.13M in one time costs to establish its cost basis for fee increases. Were evidence presented by the Port Authority to show, in response to the complainants' *prima facie* showing of unreasonableness, that the Port Authority has incurred expense reclassification costs in the range of their 2005 estimate of $2M for each of the last several years, then we could find that the Port Authority could reasonably base an estimate of $2M going forward into 2005 and beyond. . . . Because the Port Authority did not present such evidence, we determine that the Expense Reclassification portion of the fee is unreasonable.

Final Decision at 16–17. We find this logic compelling, and we affirm the DOT's decision with regard to the abandoned capital projects.

IV

The Complainants[8] likewise seek review of particular components of the DOT's Final Decision, but as a threshold matter, they object to certain evidentiary rulings underlying that order. Specifically, the Complainants maintain the ALJ erred when he refused (1) to amend the Instituting Order, (2) to order Mr. Kagan to submit to a deposition, and (3) to admit additional testimony responding to Port Authority disclosures.

In order to meet 49 U.S.C. § 47129's aggressive time limits, the DOT has promulgated regulations requiring complaints to include "all supporting testimony and exhibits on which the filing party intends to rely." 14 C.F.R. § 302.603(a) (2005). A

---

[8] We continue to refer to the Complainants in the plural, as they collaborated on their briefs and arguments before this court, but in light of our holding in Part II above, any ruling in their favor would inure to the benefit of Brendan Airways alone.

complainant's reply "may include supporting testimony and exhibits responsive to new matters raised in the answers," § 302.605(b), but aside from that exception, once the complaint is filed, complainants can generally introduce new evidence only to the extent it relies on information the respondents had previously refused to disclose, *see* § 302.603(c)(3).

Here, the Complaint certified that "[a]dditional information on which Joint Complainants intend to rely is not included with the brief, exhibits, or testimony because the Airport owner or operator has expressly refused to make that information available." Complaint at 19. Despite the defects in this certification,[9] the DOT ordered the Port Authority to disclose additional information described in Attachment 1 to the Instituting Order. Furthermore, the Instituting Order specified the ALJ could, "for good cause shown, modify Attachment 1 if the ALJ believes the circumstances so warrant." Instituting Order at 28. Finally, the Airlines were permitted to submit testimony based on information the Port Authority would disclose pursuant to Attachment 1, but the ALJ was instructed "not [to] allow Complainants to submit new evidence at the hearing without a showing of good cause." *Id.* at 3.

---

[9] Contrary to 14 C.F.R. § 302.603(c)(3), the certification did not "specify the date and form of the carrier's request for information from the airport owner or operator." The form letter the Airlines sent to the Port Authority "request[ed] that the information *required* by the Policy Statement be provided for Terminal C as well as Terminal B," Complaint Ex. C at 2 (emphasis added), when in fact the Policy Statement does not "require" the sharing of any information whatsoever, *see* Policy Statement ¶ 1.1.2 ("Appendix 1 of this policy statement contains a description of information that the Department *considers would be useful* to the U.S. and foreign air carriers . . . ." (emphasis added)); *id.* app. 1 ("The Department of Transportation *ordinarily expects* the following information to be available to aeronautical users . . . ." (emphasis added)).

The Complainants now challenge the ALJ's rulings on two of its subsequent motions. First, the Complainants moved to amend Attachment 1 so as to require additional disclosures by the Port Authority and asked to depose Mr. Kagan regarding the disclosures. Finding no "good cause" for either request, the ALJ denied the motion. Second, after the Port Authority made the required Attachment 1 disclosures, the Complainants moved to introduce testimony responding to those disclosures. Again finding good cause lacking, in that the Complainants had failed to show (1) that the testimony could not have been introduced earlier; (2) that the disclosures raised new issues warranting additional testimony; or (3) that the testimony directly responded to the disclosures, the ALJ disallowed most of the proffered testimony.

We review agency rulings on discovery with "extreme deference." *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 789 (D.C. Cir. 2000) (internal quotation marks omitted). "[T]he conduct and extent of discovery in agency proceedings is a matter ordinarily entrusted to the expert agency in the first instance and will not, barring the most extraordinary circumstances, warrant the Draconian sanction of overturning a reasoned agency decision." *Trailways Lines, Inc. v. ICC*, 766 F.2d 1537, 1546 (D.C. Cir. 1985).

We see no reason to disturb the ALJ's denial of the Airlines' motion to amend Attachment 1. The Airlines' proposed additions went well beyond the material specified in Appendix 1 to the Policy Statement, which formed the basis for their pre-Complaint requests for information from the Port Authority. Their case for good cause relied solely on the specified documents' relevance and unavailability, factors the Instituting Order deemed sufficient for the *introduction* of new evidence, but not

for the *forced discovery* of such evidence.[10] The Airlines themselves admitted "the Port Authority's responses may well contain all of the information needed to resolve the issues in this proceeding." Br. Supp. Comp'ts' Mot. Modify Attach. 1 at 3. We therefore defer to the ALJ's decision to deny the motion, as reaffirmed by the DOT in its Final Decision at 12.

The ALJ's refusal to order a deposition of Mr. Kagan was likewise sound. The Instituting Order foresaw no such depositions. Moreover, Mr. Kagan actually appeared as a witness in the hearing before the ALJ. Finding no "extraordinary circumstance[]" warranting reversal, we defer to the DOT's ruling in this matter.

The ALJ's restrictions on the Complainants' follow-on testimony present a closer question. The Instituting Order included the following instructions:

> We are, however, requiring the Port Authority to provide additional information on its fee methodologies, so the Complainants may submit testimony based on the new information at the hearing. The ALJ shall not allow

---

[10] The Instituting Order set out separate standards for these two events: "The ALJ accordingly should not allow any party to introduce additional evidence *except for good cause*, for example, if a party was unable to submit relevant and material evidence earlier due to its inability to obtain it from an opposing party." Instituting Order at 28 (emphasis added). "The ALJ assigned to this proceeding *may*, *for good cause shown*, modify Attachment 1 *if the ALJ believes the circumstances so warrant*." *Id.* (emphasis added). It is not clear that the inability to obtain relevant evidence, which the order describes as good cause for permitting the introduction of such evidence, likewise qualifies as good cause for modifying Attachment 1. Furthermore, even if good cause is present, the ALJ is merely *permitted* to ("may") modify the attachment, not *required* to do so.

Complainants to submit new evidence at the hearing without a showing of good cause.

Instituting Order at 3. It is not clear whether the second sentence was intended to constrain the first, with "evidence" subsuming "testimony," or whether instead the two sentences mere meant to indicate two separate standards for admissibility, with "testimony" generally admissible so long as it was "based on the new information," but "evidence" (*i.e.*, exhibits) admissible only upon a showing of good cause.

The ALJ read the good cause requirement as applying to testimony and measured good cause based on the degree to which the proffered testimony was truly "based on the new information." For example:

Complainants fail to establish good cause for expanding the scope of Mr. Brennan's testimony. Specifically, Complainants fail to show why the expanded proffer could not have previously been introduced or submitted. They fail to establish how the new documents and information provided pursuant to Attachment 1 of the I.O. [Instituting Order] presented new issues warranting the expended [sic] testimony of Mr. Brennan. They fail to show how expansion of Mr. Brennan's testimony . . . responds directly to the additional documents and information the I.O. directed the Respondent to provide.

Order Pursuant Comp'ts' Mot. Intro. Witness Testimony at 3. The Final Decision adopted the ALJ's evidentiary ruling, reaffirming that testimony was to be admitted only upon a showing of good cause, which in particular required that the testimony respond to new information:

The complainants gave only vague descriptions of the testimony to be offered and did not meet their burden to

> show good cause.  Because complainants did not establish that the testimony they wished to submit was based on new information from the Port Authority, the ALJ was correct to deny the complainants' Motion for Testimony.

Final Decision at 12–13.  In light of the ambiguity in the Instituting Order's instruction, we defer to the DOT's interpretation and thus deem the ALJ to have applied the proper test when determining whether the proffered testimony was admissible.[11]

Were we reviewing the DOT's application of this test *de novo*, we might reach a different conclusion than did the ALJ. According to the Complainants' motion, Dr. Kaplan was to "testify as to the economics of the cost-allocation and fee-setting methodologies utilized by the Port Authority, as revealed by the newly-produced materials and information," and accountant Robert N. Yerman was to "explain how the costs of the services provided by the Port Authority are allocated among various users."  Joint Comp'ts' Mot. Intro. Testimony Pursuant Inst. Order at 3, 5.  Both of these seem directly responsive to information disclosed pursuant to Attachment 1, such as "[t]he methods used by the Port Authority in allocating the Terminal B 'Expense' categories" and "the allocation methodology" for "direct and indirect costs" at "Terminals A, B, and C and all components thereof," Attachment 1 ¶¶ 5, 7.

---

[11] As we find the DOT's interpretation of the Instituting Order's instructions reasonable, we do not consider the ALJ's erroneous quotation of those instructions particularly problematic.  *Compare* Instituting Order at 22 ("The ALJ should allow a party to submit additional *evidence* only for good cause shown." (emphasis added)) *with* Order Pursuant Comp'ts' Mot. Intro. Witness Testimony at 2 ("'The ALJ should allow a party to submit additional *testimony* only for good cause shown.'" (emphasis altered) (quoting Instituting Order at 22)) *and* Order Pursuant Mot. Recons. at 4 (same).

But we do not review evidentiary rulings *de novo*. In light of the time pressures inherent in § 47129 adjudications, it was not unreasonable for the ALJ to demand a more specific proffer before admitting testimony not included in the Complaint. While the DOT's decision in this matter may be surprising, it does not rise to the level of the "extraordinary circumstances" we require for reversal. We therefore affirm all of the challenged evidentiary rulings.

V

Finally, the Complainants ask us to review the DOT's rejection of their discrimination claim. The Port Authority's new FIS and GTC fees applied only to ITB carriers, not to Continental, which operates out of Terminal C. The Complainants maintained the resulting difference in costs between Terminal B and Terminal C unjustly discriminated against the ITB carriers vis-à-vis Continental. The DOT's Final Decision rejected this claim, reasoning that Continental was a "signatory" in the sense of 49 U.S.C. § 47107(a)(2)(B)(ii) and that Policy Statement ¶ 3.1.1 therefore permitted the Port Authority to treat the ITB carriers and Continental differently.

The Complainants object to the DOT's ruling on their discrimination claim on five grounds. First, the Complainants argue Continental did not in fact qualify for differential treatment under Policy Statement ¶ 3.1.1. In reviewing the DOT's application of ¶ 3.1.1, we must give the Department's interpretation of that paragraph "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted); *see also Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 859 (D.C. Cir. 2006).

Paragraph 3.1.1, which was not invalidated by *Air Transport Ass'n*, reads as follows:

> The prohibition on unjust discrimination does not prevent an airport proprietor from making reasonable distinctions among aeronautical users (such as signatory and non-signatory carriers) and assessing higher fees on certain categories of aeronautical users based on those distinctions (such as higher fees for non-signatory carriers, as compared to signatory carriers).

Policy Statement ¶ 3.1.1. This language is in turn based on 49 U.S.C. § 47107(a)(2)(B), which permits "differences based on reasonable classifications, such as between—(i) tenants and nontenants; and (ii) signatory and nonsignatory carriers."

Superficially, it seems significant that ¶ 3.1.1 drops § 47107's reference to tenant status. The DOT cannot simply equate signatories with tenants, since Congress in 1987 explicitly added the signatory distinction to § 47107's predecessor, which had theretofore recognized only tenancy as a reasonable basis for classification, while retaining tenancy as a separate ground for differential treatment. *See* Airport and Airway Safety and Capacity Expansion Act of 1987, Pub. L. No. 100-223, § 109(a)(3), 101 Stat. 1486, 1499 (1987). However, the reference in ¶ 3.1.1 to distinctions *such as* signatory status suggests that other distinctions, including tenant status, may qualify as "reasonable" in the sense of ¶ 3.1.1, and under such a reading ¶ 3.1.1 would not conflict with the plain meaning of § 47107(a)(2)(B). *See Chevron*, 467 U.S. at 842–43. Indeed, the Final Decision reads ¶ 3.1.1 in just that way. Final Decision at 23 ("The DOT Policy Statement also expressly permits differences in treatment of differently situated airlines, and makes clear that tenant/non-tenant and signatory/non-signatory airlines are not similarly situated. DOT Policy Statement ¶ 3.1.1."). As this interpretation of ¶ 3.1.1 is not "plainly

erroneous," we treat it as controlling. *Thomas Jefferson Univ.*, 512 U.S. at 512.

Continental therefore benefits from Policy Statement ¶ 3.1.1 provided it qualifies as either a "tenant" or a "signatory."[12] In testing whether Continental qualifies for either status, we must rely on the DOT's decision as stated, not our own analysis from first principles. *See Detroit Newspaper Agency v. NLRB*, 435 F.3d 302, 311 (D.C. Cir. 2006) ("[W]e must accept the Board's decision on it[s] own terms, ignoring post-hoc rationalizations by counsel and rejecting the temptation to supply reasons to support the Board's decision that the Board itself has not offered."). The Final Decision treats "tenant" as synonymous with "lessee." *See* Final Decision at 23 ("[Section 47107] allows airports to treat signatory and non-signatory carriers (and carriers with leases and those without) differently."). The record demonstrates definitively that Continental leases the land under Terminal C from the Port Authority, Complainants' Ex. CA29-61 ("Continental leases from the Port Authority, pursuant to the Port Authority Leases, the premises on which the Project is located."), and the ALJ so found, Recommended Decision at 21. The Final Decision "agree[d] with and adopt[ed] the conclusions of the ALJ" on this point, noting in particular the ALJ's finding that non-ITB carriers "are not similarly situated because compensation to the Port Authority is incorporated into leases." Final Decision at 23. Thus, the DOT reasonably determined Continental was a lessee and hence eligible for preferential treatment under Policy Statement ¶ 3.1.1.[13]

---

[12] The Complainants have not claimed to qualify for either of these preferred categories.

[13] The Final Decision also found Continental was a signatory. Final Decision at 23. As the Complainants indicate, the DOT gave no explanation for this finding. However, since the DOT permissibly read Policy Statement ¶ 3.1.1 to permit differential treatment on the basis of tenancy, as well, *see Thomas Jefferson Univ.*, 512 U.S. at 512,

In their second argument, the Complainants suggest the differences in fees permitted by Policy Statement ¶ 3.1.1 are in fact barred by 49 U.S.C. § 47107(a)(2), which mandates that at federally subsidized airports:

> air carriers making similar use of the airport will be subject to substantially comparable charges—
>
> > (A) for facilities directly and substantially related to providing air transportation; and
> >
> > (B) regulations and conditions, except for differences based on reasonable classifications, such as between—
> >
> > > (i) tenants and nontenants; and
> > >
> > > (ii) signatory and nonsignatory carriers . . . .

49 U.S.C. § 47107(a)(2). A fee schedule that violated this mandate—such as by subjecting classes of air carriers[14] to charges that are not "substantially comparable"—would be patently unreasonable. However, Policy Statement ¶ 3.1.1 permits just such dissimilar fees, provided they are based on "reasonable distinctions among aeronautical users (such as signatory and non-signatory carriers)." This provision is valid only if it falls within the exception to § 47107(a)(2) stated at § 47107(a)(2)(B).

Observing that the phrase "except for differences based on reasonable classifications" is placed within § 47107(a)(2)(B), and not in the flush text of § 47107(a)(2), the Complainants infer reasonable classifications excuse dissimilar regulations and conditions but *not* dissimilar charges. However, assuming the

the Complainants' first argument fails even if we excise the finding of signatory status from the Final Decision.

[14] As 49 U.S.C. § 47107 is in Part B of Title 49, Subtitle VII, the definitions from § 40102 do not apply, and the DOT may reasonably interpret "air carrier" in this context to include non-U.S. carriers.

Airlines properly advanced this theory before the DOT, *see* 49 U.S.C. § 47129(c)(6), we reject this line of reasoning.

If the arrangement of § 47107 renders the statute ambiguous, we should defer to the DOT's reasonable interpretation. *Chevron*, 467 U.S. at 842–44. Moreover, DOT's interpretation is consistent with the original statute, requiring airports seeking federal grants to deliver assurances that

> each air carrier using such airport (whether as a tenant, nontenant, or subtenant of another air carrier tenant) shall be subject to *such nondiscriminatory and substantially comparable* rates, fees, rentals, and other *charges* with respect to facilities directly and substantially related to providing air transportation *and such nondiscriminatory and substantially comparable rules*, regulations, and conditions *as are applicable to all such air carriers* which make similar use of such airport and which utilize similar facilities, *subject to reasonable classifications* such as tenants or nontenants, and signatory carriers and non-signatory carriers . . . .

49 U.S.C. app. § 2210(a)(1)(A) (1988) (emphases added). Logically, we must read § 2210(a)(1)(A) to permit only "such . . . charges . . . and such . . . rules . . . as are applicable to all such air carriers . . . , subject to reasonable classifications," with the reasonable classifications applying to rules and charges equally. As noted above, the act codifying this provision indicated no intention to change the substance of existing laws. *See* Pub. L. No. 103-272, § 6(a), 108 Stat. at 1378.[15] Indeed, "it

---

[15] The compilers' notes accompanying this codification act indicate that the language in § 2210(a)(1)(A) was changed "to eliminate unnecessary words" and "surplus" phrases, "because of the definition of 'airport' in section 47102 of the revised title," and (ironically) "for clarity." 49 U.S.C. § 47107 note.

is well established that language revisions in codifications will not be deemed to alter the meaning of the original statute." *Rainbow Navigation, Inc. v. Dep't of the Navy*, 783 F.2d 1072, 1076 (D.C. Cir. 1986). We therefore interpret the current 49 U.S.C. § 47107(a)(2) as permitting differences in charges based on tenant or signatory status as described at Policy Statement ¶ 3.1.1 and hence reject the second argument.

Third, the Airlines contend the DOT wrongly applied a "per se test" to the question of discrimination, holding that since Continental was a lessee or signatory and the ITB carriers were not, *any* difference in their fee structures was permissible. Even if Policy Statement ¶ 3.1.1 permits airports to charge non-lessees more than lessees, the Airlines argue, there is some maximum difference beyond which the distinction should be deemed unreasonable.

Determining the difference in fees under the proposed rate increase is not unproblematic, as Continental pays the Port Authority under a fixed lease, with no per-passenger FIS or GTC fees. However, by adjusting Continental's lease payments for the costs it saves the Port Authority by maintaining Terminal C itself, one can estimate Continental's implied FIS and GTC fees. Under a per se test these implied fees would be immaterial, with Continental's status as a lessee dispositive as to questions of discrimination. Under the Complainants' preferred test, however, the proposed rate increase would be unreasonable unless the difference between Continental's implied fees and the new fees at ITB were commensurate with the carriers' difference in status.

The Complainants propose numerous grounds for finding that a per se test is improper. While several of these are without

merit, we find two at least arguably valid.[16]  We hence assume without deciding that a per se test would indeed be improper, so that the Final Decision would be invalid if it rejects the Complainants' discrimination claim based solely on a per se test.  But the Final Decision is ambiguous as to which test it applies.  While much of its language suggests a per se test, it nonetheless entertains the notion that details of the deal between Continental and the Port Authority could override the per se result:  "The record does not show the nature of the contractual relationship between Continental and the Port Authority, so the Department is without any basis for saying that the fees are unjustly discriminatory."  Final Decision at 23–24.

In essence, this sentence recognizes the Airlines failed to carry their burden of persuasion concerning the degree to which fees could reasonably differ between ITB and Terminal C. While the Complainants undeniably have the burden of persuasion as to their claim of discrimination, 5 U.S.C. § 556(d), the exception at 49 U.S.C. § 47107(a)(2)(B) could arguably be viewed as an affirmative defense.  Still, since the statute does not resolve the ambiguity, the agency is free to choose which party bears the burden of proof.  *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401–03 (1983) (allowing NLRB in mixed-motive cases to treat proof that an employee would have been fired even absent union activity as an affirmative defense, with

---

[16] First, the Airlines argue that we should resolve the ambiguity of § 47107 so as to avoid conflict with various international agreements to which the United States is a party, which they read as barring per se tests.  Second, they contend that the DOT's Policy Statement foresees a limit on rate differences based on signatory status, in that it states that extra costs and risks incurred by airport operators in serving non-signatories "would provide a justification for imposing a surcharge, *in some amount*, on non-signatory carriers" and concludes that the new rules "provide adequate flexibility to airport proprietors to charge *reasonable* surcharges to non-signatory carriers." Policy Statement, 61 Fed. Reg. at 32015 (emphases added).

the burden of persuasion placed on the employer), *reaffirmed in Dir., OWCP v. Greenwich Collieries*, 512 U.S. 267, 278 (1994) ("And although we reject *Transportation Management*'s reading of § 7(c), the holding in that case remains intact. . . . [T]he NLRB place[d] the burden of persuasion on the employer as to its affirmative defense."). Hence, the DOT did not err when it assigned this burden to the Airlines.[17]

As the Complainants put forward no evidence detailing the value to the Port Authority of Continental's signatory or lessee status, the DOT had no basis for finding the estimated difference in fees was not commensurate with the difference in costs the Port Authority incurred at each terminal.[18] Given the DOT's

---

[17] The Final Decision's separate reference to a burden placed on the Port Authority apparently indicates a burden of *production*, not persuasion. The DOT first recites the rule for the burden of persuasion and then discusses the shifting burden of production:

> When an airline seeks a determination as to the reasonableness of a fee imposed on the airline by an airport, the airline bears the burden of proof. The airline complainants *must submit evidence* sufficient to show that the challenged fees are unreasonable. However, if the complainants present a *prima facie* case that a fee is unreasonable, the burden shifts to the airport. The airport *must then submit sufficient evidence* to show that the fee is, in fact, reasonable.

Final Decision at 14 (first and third emphases added) (citations omitted). The final sentence would violate 5 U.S.C. § 556(d) if it placed the full burden of persuasion on the Port Authority as to the reasonableness of the proposed fees. *See Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 871–72 (D.C. Cir. 2002) (discussing how *Greenwich Collieries* permits a shift in the burden of production but not in the burden of "proof"; *i.e.*, persuasion).

[18] Without deciding whether a per se test would violate the Policy Statement or § 47107(a)(2), we note the Final Decision comes close to applying one. While we find here that the DOT's ambiguous statement *slightly* favors a reading that defeats the Complainants' third

permissible assignment of the burden of proof to the Complainants, the Final Decision's ruling was valid even if we excise its reliance on a per se test.

Fourth, the Complainants object to the DOT's reliance on the ITB carriers' ability to leave EWR as a basis for charging higher fees. They argue the DOT's approach "undermine[s] the protections afforded by [§ 47107] and the bilateral treaties," which assume "international airports will remain open on relatively equal terms to all airlines who want to use them, and not that some airlines will face unequal rates with their recourse being to leave the airport entirely." Comp'ts' Br. 36. But this fundamentally mischaracterizes the Final Decision's reasoning. The primary recourse available to non-signatory airlines that object to paying higher fees is signatory status. *See* § 47107(a)(3) ("[T]he airport operator will not withhold unreasonably the classification or status of tenant or signatory from an air carrier that assumes obligations substantially similar to those already imposed on air carriers of that classification or status."). As § 47107(a)(2)(B) recognizes, higher fees compensate airport operators for the risk that non-tenant airlines will leave on short notice. Here, the DOT found the Complainants had put forward no evidence tending to show the incremental fees imposed on them as non-tenants were not commensurate with the incremental risk the Port Authority incurred by letting them use ITB without long-term leases. If the Complainants felt that the higher fees hurt them more than signatory status would, they could sign a lease; they were not given a Hobson's choice of paying fees at a non-signatory level or else abandoning the airport entirely.

---

argument, the Department would do well to make its reasoning explicit, as "[w]e cannot defer to what we cannot perceive," *Int'l Longshoremen's Ass'n v. Nat'l Mediation Bd.*, 870 F.2d 733, 736 (D.C. Cir. 1989).

Finally, in their fifth line of attack, the Complainants argue the difference in fees between Terminal C and ITB cannot have been "based on" the extra costs and risks incurred by the Port Authority in servicing the ITB carriers, as required by § 47107(a)(2) and the Policy Statement, because the Port Authority admittedly did not take into account the fees charged at other terminals when it set the fees at ITB, *see* Tr. 280:14–19, 282:4–9, 283:7–10. By the Complainants' logic, even if the proposed fees happened not to differ from those imposed on Continental by enough to qualify as discrimination, the mere fact that the Port Authority did not consider this possibility when setting the rates so taints the process as to render the resulting rates unreasonable.

As the record demonstrates, the DOT has steadfastly refused to treat the fee-setting process as a basis for finding fees unjustly discriminatory. The ALJ noted the Complainants objected to "the Port Authority's methodology" in setting the rates, Recommended Decision at 20, but rejected this argument because the Policy Statement required consistent application of methodologies only across "similarly situated" or "comparable" aeronautical users, *id.* at 21 (internal quotation marks omitted); *see also* Policy Statement ¶¶ 2.1, 3.1. The Final Decision's analysis of the Complainants' discrimination claim does not discuss the Port Authority's rate-setting process at all. *See* Final Decision at 23–24. As the DOT's test clearly rejects the logic of the Complainants' fifth argument, in order to prevail they must show the DOT's test is improper.

If § 47129, § 47107, or the Policy Statement required a different test, then the Airlines might prevail, but they do not. First, on its face, § 47129(a)(1) instructs the Secretary of Transportation to determine the reasonableness of a fee, not of the process used to set the fee. Moreover, we can find nothing in the United States' international obligations that would preclude the passage of a statute creating expedited review of

the *amount* of a fee in the absence of investigation into the fee's *origin*. *Cf. Chevron*, 467 U.S. at 843 n.9; *Murray*, 6 U.S. (2 Cranch) at 118. Thus, § 47129 can reasonably be interpreted in keeping with the DOT's current test.

Similarly, § 47107(a)(2) requires airport proprietors to certify that "air carriers making similar use of the airport will be subject to substantially comparable charges" in order to receive development grants but demands no such certification regarding the processes used to set the charges. Nothing in the United States' bilateral agreements would seem to block the government from imposing such a requirement on grant applicants; nor do the agreements require the government to obtain certifications disavowing discriminatory *processes* before issuing grants. Therefore § 47107, too, can be read so as to permit the DOT's current test.

The Complainants' argument with regard to the Policy Statement is equally unavailing. An unexplained deviation from the Policy Statement could lead us to set the Final Decision aside, *see, e.g.*, *Chelsea Indus., Inc. v. NLRB*, 285 F.3d 1073, 1075–76 (D.C. Cir. 2002) ("The agency acts unreasonably if it departs from established policy without giving a reasoned explanation for the change . . . ."), but we find no such deviation. The Policy Statement includes the following rule:

Relevant provisions of the Convention on International Civil Aviation (Chicago Convention) and many bilateral aviation agreements specify, inter alia, that charges imposed on foreign airlines must not be unjustly discriminatory, must not be higher than those imposed on domestic airlines engaged in similar international air services and must be equitably apportioned among categories of users. *Charges to foreign air carriers for aeronautical use that are inconsistent with these principles will be considered unjustly discriminatory or unfair and unreasonable.*

Policy Statement ¶ 3.3 (emphasis added). In light of our holding above that foreign air carriers are not "air carriers" in the sense of § 47129(a)(1), it is not clear that ¶ 3.3, which deals only with "[c]harges to foreign air carriers," can serve as a ground for finding fees unreasonable in § 47129 proceedings. However, assuming *arguendo* that this is the case, we believe ¶ 3.3 measures discrimination based on the size of charges, not on the process that produces them. Paragraph 3.3 does not explicitly indicate otherwise, and the convention and bilateral agreements it incorporates by reference all focus on the magnitude of fees rather than the processes behind them. *See, e.g.*, Bermuda II, art. 10(2) (describing as "unjustly discriminatory" user charges that are higher than those imposed on similar domestic airlines); Air Transport Agreement Between the Government of the United States of America and the Government of the Kingdom of the Netherlands, U.S.-Neth., art. 7(a), Apr. 3, 1957, 12 U.S.T. 837, *as amended by* Aviation Transport Services Agreement Between the United States of America and the Netherlands, U.S.-Neth., ¶ 8(1), May 11, 1993, T.I.A.S. No. 11,976 (requiring that user charges be assessed "on terms not less favorable than the most favorable terms available to any other airline at the time the charges are assessed"); Convention on International Civil Aviation, art. 15, *opened for signature* Dec. 7, 1944, 61 Stat. 1180, 15 U.N.T.S. 295 (barring charges that are higher than those imposed on domestic carriers). As the DOT's test does not violate the Policy Statement either, it is permissible. We thus reject all of the Airlines' proposed grounds for setting aside the DOT's finding that the fee increase was not unjustly discriminatory.

## VI

For the foregoing reasons, the Port Authority's petitions for review are granted, and the Complainants' petition for review is denied. The DOT's Final Decision is vacated to the extent it

requires the Port Authority to pay refunds to carriers other than Brendan Airways. The DOT's finding that the Port Authority's inclusion of its 2004 Expense Reclassification charge in its 2005 cost forecast was unreasonable is affirmed to the extent it relates to costs incurred on canceled capital projects, but vacated to the extent it relates to signage expenses. As the Port Authority's revised fee proposal was based on the DOT's ruling on signage expenses, the July 12 Order is likewise vacated to the extent it implements that fee proposal. All other challenged portions of the DOT's Final Decision and July 12 Order are affirmed. The case is remanded to the DOT for whatever further proceedings should be required, consistent with this opinion. On remand, the DOT is instructed to dismiss the Complaint to the extent it applies to carriers other than Brendan Airways.

*So ordered.*