# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 11, 2008      Decided August 7, 2009

No. 07-1209

ALASKA AIRLINES, INC. ET AL.,
PETITIONERS

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,
RESPONDENT

CITY OF LOS ANGELES ET AL.,
INTERVENORS

———

Consolidated with 07-1223, 07-1273, 07-1276

———

On Petitions for Review of Orders of the
Department of Transportation

———

*M. Roy Goldberg* argued the cause for petitioners Terminal 1 and 3 Airlines and the Air Transport Association of America, Inc. With him on the briefs were *Robert W. Kneisley*, *Howard E. Kass*, *Robert P. Silverberg, Claire L. Shapiro*, and *David A. Berg*.

*Steven S. Rosenthal* argued the cause for petitioner the City of Los Angeles and intervenor Airports Counsel

International - North America.  With him on the briefs were *Jeffery A. Tomasevich*, *J. D. Taliaferro*, and *Scott P. Lewis*. *Douglas A. Tucker* entered an appearance.

*Mary F. Withum*, Senior Trial Attorney, U.S. Department of Transportation, argued the cause for respondent.  With her on the brief were *Robert B. Nicholson* and *Nickolai G. Levin*, Attorneys, U.S. Department of Justice, *Paul M. Geier*, Assistant General Counsel, U.S. Department of Transportation, and *Dale C. Andrews*, Deputy Assistant General Counsel.

*M. Roy Goldberg* argued the cause for intervenor Terminal 1 and 3 Airlines.  With him on the brief were *Robert W. Kneisley* and *Howard E. Kass*.

*Steven S. Rosenthal* argued the cause for intervenors the City of Los Angeles and Airports Counsel International - North America.  With him on the briefs were *Jeffery A. Tomasevich*, *J. D. Taliaferro*, and *Scott P. Lewis*.  *Patricia A. Hahn* entered an appearance.

Before: GINSBURG, GARLAND, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*: Various airlines asked the Department of Transportation (DOT) to declare unlawful certain of the methods used by the City of Los Angeles to calculate the rental rates they pay for terminal space at Los Angeles International Airport (LAX).  Both the City and the airlines petition for review of the DOT's Final Decision, *Alaska Airlines v. Los Angeles World Airports*, Docket No. OST-2007-27331, 2007 DOT Av. LEXIS 437 (Jun. 15, 2007)

(*Final Decision*). We grant each petition in part, deny each petition in part, and remand the matter to the DOT for further proceedings.

## I. Background

The airline petitioners (T1/T3 Airlines) rent space in Terminals 1 and 3 at LAX. The City charges the airlines a "base rent" for their terminal space plus a share of the airport's maintenance and operation (M&O) costs. Each airline's base rent and M&O charges are determined in part by multiplying a fee per square foot by the amount of terminal space the airline occupies; an airline's rent may change, therefore, if the City changes either the fee per square foot or the way in which it calculates the amount of terminal space occupied by the airline. When the leases of the T1/T3 Airlines expired and negotiations over new lease terms reached an impasse, the City, seeking increased rental payments to offset increased security costs and to pay for planned airport improvements, adopted a new methodology, increasing both the fee per square foot and the amount of terminal space attributed to each airline.

The new methodology introduced three changes here relevant. First, the City increased M&O charges for all airlines operating out of LAX, including not only the T1/T3 Airlines but also airlines with leases that had not expired. Second, the City changed the formula for calculating the T1/T3 Airlines' rent. Under the "useable space" formula previously employed, the City had multiplied the rental fee by the amount of space used exclusively by each airline. Under the new "rentable space" formula, the City allocated to each of the T1/T3 Airlines a share of the terminal's common areas, such as corridors and stairwells, thus increasing its square footage and hence its base rent. Finally, the City newly based

the fee per square foot for the T1/T3 Airlines upon the "fair market value" (FMV) of the space, whereas under the expired contracts, the rental fee had been based upon the "historical cost" of the space.

Airlines in other terminals continue to pay rent based upon the historical cost of useable space; the City is unable to impose its new methodology upon these carriers because they have long-term leases, entered into in the 1980s and still in effect. The City nonetheless increased those airlines' M&O charges, but after the airlines filed suit, ultimately settled for a lesser increase.

The T1/T3 Airlines complained to the DOT that the new charges imposed by the City were unreasonable and, as compared with the charges paid by airlines using other terminals, unjustly discriminatory. The DOT assigned the matter to an Administrative Law Judge, who recommended the DOT rule in favor of the T1/T3 Airlines in most respects. *Recommended Decision of U.S. Administrative Law Judge Richard C. Goodwin*, Docket No. OST-2007-27331 at 77-78 (Dep't of Transp. May 15, 2007). The DOT rejected much of the ALJ's recommendation and held: (1) The increase in M&O charges was reasonable and non-discriminatory; (2) the rentable space methodology unjustly discriminated against the T1/T3 Airlines; and (3) the City may use fair market value rather than historical cost in setting terminal fees but the particular method it used was unreasonable as applied to the T3 Airlines; because the T1 Airlines did not file a separate written complaint with the Secretary of Transportation within the time required by statute, the DOT did not consider whether the fair market value method was unreasonable as applied to them. *Final Decision*, 2007 DOT Av. LEXIS 437, at *1.

Both the T1/T3 Airlines and the City petition for review of the Final Decision. The T1/T3 Airlines argue (1) the increase in M&O fees is unjustly discriminatory; (2) it was unreasonable for the City to use fair market value but, if the City was permitted to use fair market value, then the DOT should have decided whether its use was unreasonable as applied to the T1 as well as the T3 Airlines; and (3) the DOT erred by declining to consider whether LAX has monopoly power. For its part, the City argues (1) the DOT should not have considered whether the M&O fee increase was unreasonable; (2) the method it used to determine fair market value was reasonable; and (3) the rentable space methodology does not unjustly discriminate against the T1/T3 Airlines because they are not entitled to the benefits for which the airlines with long-term leases bargained.

## II. Analysis

This case arises under 49 U.S.C. § 47129(a)(1), which provides that, upon written request, the DOT "shall issue a determination as to whether a fee imposed upon one or more air carriers ... is reasonable." To approve of a fee increase, the DOT must have "receive[d] written assurances ... that ... air carriers making similar use of the airport will be subject to substantially comparable charges." 49 U.S.C. § 47107(a)(2). The DOT's "findings of fact are conclusive if supported by substantial evidence; and we will affirm [its] decision unless it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *City of Los Angeles Dep't of Airports v. DOT* (*LAX I*), 103 F.3d 1027, 1031 (D.C. Cir. 1997) (internal citations omitted).

We begin by considering the challenges to the M&O fee increase. Next, we turn to the DOT's assessment of the City's use of FMV. We then determine whether the DOT

erred in holding the City's rentable space methodology was discriminatory. Finally, having analyzed the DOT's treatment of particular aspects of the City's new methodology for calculating rent, we consider the airlines' overarching objection to the DOT's analysis, namely that the agency should have considered whether LAX has monopoly power in a relevant geographic market.

A.  M&O Charges

Although the DOT held the M&O fee increase was reasonable, the City petitions for review on the ground that, because the increase was imposed "pursuant to a written agreement with air carriers using the facilities of an airport," 49 U.S.C. § 47129(e)(1), the DOT did not have the authority to determine whether it was reasonable. The agreements to which the City refers are the T1/T3 Airlines' leases, which had expired, and pursuant to which the T1/T3 Airlines were occupying terminal space as holdover tenants upon a month-to-month basis. According to the City, the continuing application of the expired leases and the City's reliance upon the clauses in each allowing for "adjustment" of the M&O rent deprives the DOT of authority to review the reasonableness of the increase. The DOT, however, held the "written agreement" exception did not apply because "[a] standard or boilerplate 'holdover' agreement, creating a tenancy at will on a month to month basis, subsequent to lease expiration, does not constitute the type of written agreement that forecloses a § 47129 proceeding." *Final Decision*, 2007 DOT Av. LEXIS 437, at *104.

The T1/T3 Airlines challenge neither the DOT's authority nor the reasonableness of the increased M&O charge but rather argue the result of the increase was unjustly discriminatory vis-à-vis other airlines at LAX, in violation of

49 U.S.C. § 47107(a)(2). The City nonetheless disputes the DOT's decision that the "written agreement" exception did not apply "because," it says, it fears "the future effects of [the] incorrect ruling." Because the airlines do not challenge the decision under 49 U.S.C. § 47129, there is no case or controversy as to whether the "written agreement" exception applies; even if we held the DOT lacked authority to consider the reasonableness of the increase in M&O charges, that holding would not have any effect on the charges. Because "no justiciable 'controversy' exists when parties ... ask for an advisory opinion," *Mass. v. EPA*, 549 U.S. 497, 516 (2007) (citing *Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792)), we cannot decide the question presented by the City.

We reject the T1/T3 Airlines' argument that the increase in M&O fees was unjustly discriminatory. As of the date of the Final Decision, all airlines operating out of LAX were paying the increased M&O fees. At some time between that date and the filing of the T1/T3 Airlines' petition for review, the City and the airlines operating out of the other terminals agreed, in settlement of their dispute, to a lesser increase in the M&O fee. Although the DOT could not have foreseen the outcome of that litigation, the T1/T3 Airlines argue the Department should have considered the possibility that the other airlines would either prevail in or reach a favorable settlement of their dispute with the City.

The DOT did not act unreasonably in refusing to consider the range of potential outcomes in the litigation between the City and the other airlines. The DOT could not determine whether the T1/T3 Airlines were being unjustly discriminated against without knowing whether the other airlines had achieved a favorable result with the City, much less whether the result was so favorable as to constitute unjust discrimination against the T1/T3 Airlines. The DOT's

decision to base the Final Decision upon what it knew, rather than upon what it might have predicted, was not arbitrary and capricious.

B.   Rent Per Square Foot

Both the T1/T3 Airlines and the City find fault with the DOT's treatment of FMV.   The T1/T3 Airlines argue the Final Decision is arbitrary and capricious because the DOT failed to explain why, although an airport may not use FMV, as measured by opportunity cost, when setting airfield rental rates, it is permitted to use opportunity cost in setting FMV rates for space inside a terminal.   The City objects to the DOT's dual requirements that, in using FMV to set terminal rates, the City may look to the opportunity cost of devoting the space only to "other aeronautical uses," and must use an independent appraiser to determine FMV.   Finally, the T1 Airlines argue the DOT erred in holding the City's use of FMV was unreasonable as applied only to the T3 Airlines on the ground that the T1 Airlines had failed to complain to the DOT within the time allotted by statute.

1.   Airfield vs. non-airfield space

In *LAX I* we held the Anti-Head Tax provision of the Federal Aviation Act does not prohibit an airport from considering its opportunity cost in setting airfield fees.   103 F.3d at 1034.   We directed the DOT on remand to decide whether an FMV methodology that considers the most valuable alternative use of the land would more accurately "reflect [its] true cost."   *Id.*   In *Air Transport Association of America v. DOT* (*ATA*), 119 F.3d 38, 40 (1997), we reviewed the subsequent Policy Statement, in which the DOT distinguished between "airfield fees — aeronautical fees charged for the use of runways, taxiways, ramps, aprons, and

roadway land," and the fees for the use of all other airport space. *Id.* The Policy Statement required airports to set airfield fees based upon "historic cost" but allowed them to use "any reasonable methodology," including opportunity cost, to set non-airfield fees. *Id.* In vacating the Policy Statement we observed: "[T]he [DOT] simply has not explained why fair market valuation may be appropriate for other portions of the airport, but [is purportedly] too difficult to use in valuing airfield assets." *Id.* at 44.

The T1/T3 Airlines argue the DOT has again failed to explain its disparate treatment of fees for airfield and for non-airfield (*i.e.*, terminal) space. The Final Decision merely tracks the Policy Statement, asserting it is "within [the DOT's] discretion" to allow an airport to consider opportunity cost when setting non-airfield fees, *Final Decision*, 2007 DOT Av. LEXIS 437, at *157, and adds that nothing in the "controlling decisional guidance precludes the use of FMV," *id.* at *153. Both statements may be true, but neither is a reasoned basis for allowing an airport to use opportunity cost as a measure of FMV for one type of airport space and not another. We must therefore grant the T1/T3 Airlines' petition and again remand the matter to the DOT either to justify or to abandon its disparate treatment of airfield and non-airfield space.

2.    Other aeronautical uses of terminal space

Although it approved of using FMV in theory, the DOT went on to hold the City may not base terminal rents upon a measure of FMV that takes account of what non-aeronautical users, such as retail merchants, would be willing to pay for terminal space. The City argues this limitation was arbitrary and capricious because the DOT failed to offer a satisfactory explanation for its disparate treatment of aeronautical and

non-aeronautical uses. The DOT supported its position with the observation that "airports have grant assurance obligations to operate the facility for aeronautical purposes." *Id.* at \*152.

In *LAX II* we upheld the DOT's decision to bar setting airfield rates based upon the opportunity cost of non-aeronautical uses, *City of Los Angeles v. DOT*, 165 F.3d 972 977-79 (1999), because the City was legally obligated to use the airfield land as an airport. *Id.* at 976 ("The Department ... concluded that it would be unreasonable for the City to recover compensation through its landing fees for a 'lost opportunity' that does not lawfully exist"). The DOT offers the same rationale to justify the prohibition against considering non-aeronautical uses for space inside the terminal.

Although an airport is obligated to use non-airfield space to support airport services, the DOT does not suggest all non-airfield space must be dedicated solely to aeronautical uses, which would be to deny the obvious; these days commercial airports feature many retail vendors of food, clothing, toiletries, periodicals, and more. A commercial airport foregoes lost opportunities aplenty when it leases to an airline space it could lease to a non-aeronautical tenant. The difference between the airfield and the terminal is that aeronautical and non-aeronautical uses cannot coexist in the airfield; safety, among other reasons, precludes retail or other non-aeronautical operations on the tarmac or runways. In the terminal, by contrast, aeronautical and non-aeronautical businesses are compatible, perhaps even complementary. It makes no sense, therefore, to say the City may not rely upon the rental value of retail space in calculating the FMV of terminal space leased to airlines because "airports have grant assurance obligations to operate the facility for aeronautical purposes." *Final Decision*, 2007 DOT Av. LEXIS 437, at

*152. An airport does not cease to operate for aeronautical purposes because it also rents terminal space to a retailer. The DOT's decision to limit the City's use of FMV to the consideration of lost aeronautical opportunities is therefore arbitrary and capricious. We grant the City's petition in this respect and direct the DOT on remand, either to justify or to abandon its objection to the City's considering non-aeronautical uses when setting terminal rents based upon FMV.

### 3. Third-party appraisal

The City also argues it was arbitrary and capricious for the DOT to require that it obtain "a neutral third party appraisal," *id.* at *151, in order to determine the FMV of rental space. The DOT's concern was that the City's "establishment of fair market value was not an objective determination, but rather a determination established ... in-house" by the City itself. *Id.* at *158. The City objects to the notion that an in-house appraisal may not be objective and reliable. Be that as it may, one need not consult precedents to see that requiring an independent appraisal to ensure an objective determination of the FMV for terminal space is neither arbitrary nor capricious but only a prudent acknowledgement of human nature and institutional incentives.

### 4. Timeliness of T1 Airlines' objection

An air carrier may appeal to the DOT for review of an airport charge per 49 U.S.C. § 47129(a)(1)(B), as follows:

> The Secretary of Transportation shall issue a determination as to whether a fee imposed upon one or more air carriers ... by the owner

or operator of an airport is reasonable if ... a written complaint requesting such determination is filed with the Secretary by an affected air carrier within 60 days after such carrier receives written notice of the establishment or increase of such fee.

When the T1/T3 Airlines filed their complaint, only the T3 Airlines had received notice that their non-airfield rent would be based upon FMV. The City did not give notice to the T1 airlines until after the complaint had been filed. The ALJ advised the T1 Airlines that because the complaint had already been filed, it was unnecessary to "revise" the complaint in order for the T1 Airlines to join the T3 Airlines' arguments against the City's use of FMV. Upon review, however, the DOT held "[t]he reasonableness of the market method [as applied] to the T1 Carriers ... is outside the scope of this proceeding." *Final Decision*, 2007 DOT Av. LEXIS 437, at *15 n.5.

In support of their petition for review by this court, the T1 Airlines argue the ALJ's invitation equitably tolled the 60 day requirement. The DOT responds that the 60 day requirement limits the agency's jurisdiction and therefore could not be equitably tolled.

As the Supreme Court has observed, "the law typically treats a limitations defense as an affirmative defense that the defendant must raise at the pleadings stage and that is subject to rules of forfeiture and waiver .... [and] permit[s] courts to toll the limitations period in light of special equitable considerations." *John R. Sand & Gravel Co. v. United States*, 128 S.Ct. 750, 753 (2008). Some statutes of limitations however,

> seek not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal .... The Court has often read the time limits of these statutes as more absolute, ... forbidding a court to consider whether certain equitable considerations warrant extending a limitations period. As a convenient shorthand, the Court has sometimes referred to the time limits in such statutes as "jurisdictional."

*Id.* (internal citations omitted).

In *Zipes v. Trans World Airlines*, the Supreme Court held the statute that required filing with the Equal Employment Opportunity Commission a claim under Title VII of the Civil Rights Act of 1964 was not jurisdictional because "it does not speak in jurisdictional terms or refer in any way to the jurisdiction" of the tribunal. 455 U.S. 385, 394 (1982). Nor does § 47129(a) speak in jurisdictional terms or refer in any way to the Secretary's authority. The statute simply requires the Secretary to issue a determination upon receiving a timely-filed written complaint; it is silent as to whether the Secretary may, in his discretion, act upon a complaint that does not meet all the formalities. *Cf. Wilbur v. CIA*, 355 F.3d 675, 676-78 (D.C. Cir. 2004) (per curiam) (finding jurisdiction where agency, in its discretion, accepted appeal four years after deadline).

The DOT argues its interpretation of the statute is owed deference pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837: If the Congress has "directly spoken to the precise question at issue," *id.* at 842, then we must "give effect to the unambiguously expressed intent of Congress," *id.* at 843; if

instead the "statute is silent or ambiguous with respect to the specific issue," then we defer to the DOT's interpretation so long as it is "based on a permissible construction of the statute." *Id.* Here the statute is silent as to whether the Secretary may exercise his jurisdiction without having received a timely-filed complaint. But the DOT's interpretation is not based upon a permissible construction of the statute because it ignores both *John R. Sand & Gravel* and *Zipes*. The former case teaches that a statute of limitations ordinarily serves only as an affirmative defense, 128 S.Ct. at 753, the latter that a statute of limitations is "jurisdictional" only if it speaks in jurisdictional terms.

Consequently we hold the 60-day time limit in 49 U.S.C. § 47129(a) is not a jurisdictional requirement but is rather the type of limitation that, when raised as an affirmative defense, is subject to rules of forfeiture, waiver, and equitable tolling. Accordingly, on remand the DOT must consider any argument the T1 Airlines have preserved that the 60-day limitation ought not be enforced against them.

C. Rentable Space

Because the T1/T3 carriers and the airlines with long-term leases are "making similar use of the airport" but are not "subject to substantially comparable charges," the DOT held the rentable space methodology used by the City ran afoul of the requirement of non-discrimination in 49 U.S.C. § 47107(a)(2). The City disputes neither that the rentable space methodology leads to substantially higher charges for the T1/T3 Airlines, nor that the T1/T3 Airlines and the long-term lessee airlines make similar use of airport common areas. Instead the City argues, as it did before the DOT, that the T1/T3 Airlines are not situated similarly to the long-term tenants, which struck their bargains with LAX more than two

decades ago. This distinction, the City contends, creates a "reasonable classification" such that the two groups may lawfully be charged different rates.

The City also argues the Final Decision is contrary to law because the DOT improperly placed upon it the burden of persuasion that the difference in rents was based upon a reasonable classification. In *Port Authority of New York and New Jersey v. DOT* (*Newark*), we considered a petition filed by several airlines for review of a DOT decision denying their claim of unjust discrimination under § 47107. 479 F.3d 21, 39-45 (2007). In that case the airport did not charge Continental Airlines certain fees it charged other airlines because Continental, unlike the others, operated and maintained its own terminal. *Id.* at 42. We held the airline complaining of unjust discrimination had the burden of showing another airline making similar use of the airport was not subject to comparable charges. *See id.*; 49 U.S.C. § 47107(a)(2). On the other hand, as we said, the statutory exception for a difference based upon a reasonable classification, *see* 49 U.S.C. § 47107(a)(2)(B), "could arguably be viewed as an affirmative defense," as to which "the agency is free to choose which party bears the burden of proof," 479 F.3d at 42. We were quite clear, however, the DOT "would violate [§ 556(d) of the Administrative Procedure Act] if it placed the full burden of persuasion on the [airport] as to the reasonableness of the proposed fees." *Id.* at 43 n.17; *see* 5 U.S.C. § 556(d) ("the proponent of a[n] ... order has the burden of proof").

Before the DOT in this case, the City argued "it can reasonably distinguish between airlines who signed long-term leases in the 1980s ... on the one hand, and airlines who did not sign leases of that duration ... on the other hand." *Final Decision*, 2007 DOT Av. LEXIS 437, at *166. In support of

this affirmative defense, the City pointed to its need "to expand LAX for the 1984 Olympic Games," which the long-term leases facilitated. *Id.* at \*175. There is indeed evidence in the record that the airlines with long-term leases got them in return for their part in helping LAX secure financing for the needed expansion, whereas at least some of the T1/T3 Airlines declined the same offer. Because the City asserted and placed evidence in the record that the rate differential was based upon a reasonable classification, thus perfecting its affirmative defense, the burden rested upon the complaining T1/T3 Airlines to persuade the DOT that the City's classification was not reasonable. *See Newark*, 479 F.3d at 43 n.17.

There is no mention in the Final Decision of any evidence the T1/T3 Airlines introduced to show the City's distinction between the long-term tenants and the T1/T3 Airlines was not reasonable; the T1/T3 Airlines simply stated the size of the fee disparity and that the various airlines made similar use of their terminal space. The DOT nonetheless ruled as follows:

> Because carriers making similar use are not being charged on a comparable basis, and because [the City] has not offered an adequate justification for this practice, we think the use of the rentable space methodology in [this] context ... violates the prohibition against unjust discrimination.

*Final Decision*, 2007 DOT Av. LEXIS 437, at \*149-50. By holding the City's justification "inadequate" without pointing to any evidence to that effect put forward by the T1/T3 Airlines, the DOT effectively assigned the burden of persuasion to the City, whereas the Administrative Procedure

Act places that burden squarely upon the complaining airline. 5 U.S.C. § 556(d); *see Newark*, 479 F.3d at 43 n.17.

Because the DOT failed to require the T1/T3 Airlines to put forward evidence that the City's distinction between long- and short-term tenants was unreasonable, the Final Decision contains no discussion of whether the economic conditions facing LAX and the airlines in the 1980s justified the disparate treatment of the long-term tenants. We therefore grant the City's petition to the extent of directing the DOT on remand to revisit the T1/T3 Airlines' complaint of discrimination and to apply to them the burden of persuasion that their disparate treatment is unjust.

D. Monopoly Power

We now turn to the elephant in the room: Whether LAX had monopoly power over the provision of commercial airport services in a relevant geographic market. LAX's monopoly power *vel non* is relevant both to whether the City could lawfully consider evidence of fair market value to set rental rates for terminal space and to whether the rentable space methodology unjustly discriminated against the T1/T3 Airlines. The extent to which market value may be considered "fair" is surely affected by whether the market is competitive rather than dominated by a government with monopoly power. Whether it was unjust for the City to charge the T1/T3 Airlines, but not the other airlines, rent for a portion of terminal common areas might also be affected by the City's alleged monopoly position; a more competitive market might have led to rent based only upon area used exclusively by an airline. *See Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 44 (2006) (observing price discrimination "is strong evidence of market power").

In the Policy Statement under review in *ATA*, the DOT responded this way to airlines' concern that airports would exercise monopoly power in setting fees:

> The carriers' claims ... are not supported by the Department's experience .... Airport proprietors generally seek to improve air services for their communities. This objective would be frustrated by charging exorbitant fees for aeronautical facilities .... In the extraordinary situation, the Department would consider airline complaints concerning significant disputes through an expedited administrative procedure (14 CFR Part 302).

*Policy Regarding Airport Rates and Charges,* 61 Fed. Reg. 31,994, 32,007 (1996). In their complaint, the T1/T3 Airlines unmistakably raised the issue when they alleged the City "has monopoly power over access to LAX, and airlines must have access to LAX on fair and reasonable terms in order to serve the Los Angeles region effectively." *Joint Complaint in Opposition to New Terminal Charges at Los Angeles Int'l Airport* at 22. The ALJ did not overlook this issue; he found LAX had monopoly power. The DOT, however, disregarded that finding because it said the "issue was not within the scope of the Instituting Order." *Final Decision*, 2007 DOT Av. LEXIS 437, at *185.

The Policy Statement clearly stated the DOT would consider whether an airport impermissibly exercised monopoly power if an airline sought its review using the procedure the T1/T3 Airlines followed. The T1/T3 Airlines raised the issue in their complaint, but the DOT failed to include the issue in the Instituting Order. *See Instituting Order*, Docket No. OST-2007-27331 (Dep't of Transp. March

16, 2007). It was arbitrary and capricious for the DOT, having invited airlines to raise the monopoly power issue, when it was raised to ignore it without good and sufficient reason. On remand the DOT must explain why this case does not present the "extraordinary situation" in which alleged monopoly power is relevant to a fee dispute or, if it cannot, then go on to consider whether LAX had monopoly power in a relevant geographic market.

## III. Conclusion

For the foregoing reasons, we grant both the City's and the Airlines' petitions in part, deny both in part, and remand this matter to the DOT for further consideration. With respect to the Airline petitioners, we uphold the increased M&O fees as non-discriminatory, and direct the DOT to explain why an airport may use FMV to set non-airfield rates but not airfield rates. We further hold 49 U.S.C. § 47129(a) is not a jurisdictional statute of limitation and direct the DOT to determine whether the 60 day filing requirement should be tolled with respect to the T1 Airlines. Finally, we direct the DOT on remand to consider whether LAX has monopoly power and, if so, how that affects the City's methods for calculating the rent to be paid by the T1/T3 Airlines.

As to the City's petition, on remand the DOT shall explain or abandon its position that, in establishing the FMV for non-airfield space, the City may consider only "other aeronautical uses." We find no fault with the DOT's requirement that FMV be established by an independent appraisal. Finally, we hold the DOT unlawfully placed the burden of persuasion upon the City to justify its use of different methods for determining rentable space for the T1/T3 Airlines and the long-term tenants.

20

*So Ordered.*